## JOSSEY v. GEORGIA SOUTHERN AND FLORIDA RAILWAY COMPANY.

One who signs a contract which recites that in consideration of a stated sum paid him by a railroad company he releases it from all liability for a personal injury, which he contends was caused by its negligence, will be estopped from claiming that the release is not binding upon him, because he thought when he signed the contract that it related only to the time he lost in consequence of the injury and did not cover damages caused thereby, when it appears that no fraud of any kind was practiced upon him, and that having ample opportunity and capacity to read and understand the contract before he signed it, he negligently failed to do so.

Argued November 8,—Decided December 8, 1899.

Action for damages, etc.　　Before Judge Littlejohn.　　Dooly superior court.　　February term, 1899.

R. M. Jossey brought suit against the Georgia Southern and Florida Railway Company, to rescind a contract signed by him, releasing the company from liability for a personal injury sustained by him, and to recover damages for the injury.　So much of the evidence as is material to the consideration of the case was as follows:

"RELEASE VOUCHER.

"Whereas I, R. M. Jossey, of the County of Bibb, State of Georgia, have a claim against Georgia Southern & Florida Railway Company, for the alleged mashing of my right arm while coupling cars, occurring at or near Cordele, Ga., on or about the 17th day of July, 1896, under circumstances which I claimed renders the said Georgia Southern & Florida Railway Co. liable to me in damages, which claim is denied by said company; and whereas both parties desire to adjust, compromise, and settle the matter: Now, therefore, I hereby acknowledge receipt from said Georgia Southern & Florida Railway Company of the sum of forty dollars, and in consideration of said payment I hereby compromise said claim, and acquit, discharge, and release said Georgia Southern & Florida Railway Company, its officers, agents, and employees, of and from any and all liability for said injury or any results, direct or indirect, arising therefrom, and acknowledge full accord and satis-

faction therefor. And I hereby expressly state that the above consideration is in full for this release, and that there is no understanding or agreement of any kind for any further or future consideration whatsoever, implied, expected, or to come to me, in money, employment, or otherwise. This the 17th day of August, 1896.

" Witness: M. R. Meadows. [Signed] R. M. Jossey.

" Approved for payment.

[Signed] William Checkley Shaw, Vice-President.

" Correct.    Audited.

[Signed] W. M. Craven,    [Signed] A. T. Sherwood,
    M. of T.    Auditor.

"Approved. [Signed] J. Lane.

A rule for the government of the railway company's employees, taken from its book of rules, and which was introduced in evidence, was as follows: "If an employee should be disabled by sickness or other cause, the right to claim compensation will not be recognized. An allowance, if made, will be a gratuity justified by the circumstances of the case and the employee's previous good conduct."

Jossey, the plaintiff, testified as follows: "My full name is Rufus M. Jossey. I was employed by the defendant about two years and a half. In July, 1896, I was in the employment of the defendant as flagman on a local freight-train. Part of my duties were to couple cars. About that time I received an ininjury to my right arm at Cordele, Dooly county, Georgia. I was injured while cutting off a car. I was caught between the dead-blocks, and the bones were broken extending to the elbow. The bones were dislocated, cracked, crushed unto my elbow." The testimony of the plaintiff as to how the injury occurred is omitted. He identified his signature to the release voucher or contract, and testified: " When I got so I thought I was able to work, I went to Mr. Craven and asked him if he intended to pay me anything for lost time; he said yes. He fixed up a paper, handed it to me, and told me to take it to the cashier, Mr. Austin. I did not know what the paper had on it. I did not read it. I just thought it was a voucher for my lost time. I never signed but one paper in reference to

this injury. I signed this one Mr. Craven handed me to sign. He told me to take it to the cashier. The cashier gave me $40.00 at the time the paper was signed. Nothing was said between me and Mr. Craven in reference to my injuries. I agreed with him about the lost time; the only conversation I had with him was in reference to my lost time. We had no talk whatever about the injuries I had received, and the settlement for it. I never knew until you [Mr. J. H. Hall] told me that the railroad claimed that I had released them from the claim for my injuries. You told me about it in Macon. I had no idea up to that time that I had given a receipt for my claim for injuries. I would have earned about one month's wages, about $40.00, from the time I was hurt up until I settled. Craven was trainmaster of defendant. I will be twenty-four years old next August. I can read and write. I took the paper in my hands to sign it, and did sign it. I could have read it and could have known what was in it. I did not read it, and I guess it was my own fault that I did not read it. The month's wages would have amounted to about $40.00; that would be about the average of it. I was paid by the mileage. I was needed on every run, unless I stopped for sickness or something. I was under the impression that I had a regular run at that time. I do not remember exactly how many trips I made before the 17th of July. I do not remember exactly whether I made regular trips that month or not. My pay depended upon the trips I made; if I did not make a trip, I did not get any pay. Q. If you made a trip every day in the month except Sunday, it would amount to about $40.00 per month? A. I mean to say that was just about the salary on the road. Q. Did you get any salary? A. I guess you will call it a salary, what I got every month. Q. You know what I mean; you know the distinction between a salary and paid by the trip — a salary is so much a month, a certain amount. A. No, sir, I did not get any certain amount. If I made a trip, I got pay; if I did not, I did not get any pay. . .

I signed the release voucher on the 17th of August. I do not remember whether I went to work the next day or not; I think not; I think it was a week or two afterwards. I do

not remember exactly how many trips I made in August, 1896. I can not say whether I made a single trip or not.    I went back to the road as baggage-master, not as flagman.    I first went back as baggage-master on the 'shoo-fly.'    As baggage-master I had to handle large trunks.    It is not true that handling baggage is harder work than putting on brakes, it depends on how you handle it.    Baggage-masters have to throw up wood on the 'shoo-fly'; on the other trains they burn coal. They have to handle baggage and to throw it out.    Mr. Lane and I had a dispute about a trunk, and I quit, and then sued. It is true that I never knew anything about having signed that paper until I sued.    I was paid by the trip after my injuries.    I made $45.00 a month, if I went every trip.    The pay of a baggage-master was a little more than that of a flagman.
.  .  From the time that I was injured, on the 17th of July, until the 17th day of August I made no trips at all, but I think possibly it was about two weeks after drawing that money that I didn't make any.    I think it was quite a while after signing that paper before I went back to work.  .  .  Mr. Lane was the superintendent of the Georgia Southern & Florida Railway at the time I made settlement.    Q. Did you know at the time that you went to Mr. Craven, to whom you went for your lost time, that he had authority to make settlements for injuries?    A. No, sir, I just mentioned it to Mr. Craven.    Q. If you had wanted to have settled for your injuries, whom would you have gone to?    A. Mr. Lane, the general manager.    Q. What authority had Mr. Craven for making settlements for injuries?    A. None at all.  .  .  Q. Did you not talk with Mr. Lane about getting your claim for damages?    A. No, sir, I never spoke to him, never but once in my life.    Q. When was that, before or after the accident?    A. That was just after this accident, just before I quit the road, in reference to a trunk."

Joseph H. Hall, counsel for the plaintiff, testified as follows: "On the date that the notice was dated, I tendered to the Georgia Southern & Florida Railway Company, in cash, the amount of $40.00 and the amount of two dollars and something interest for Mr. Jossey, and they refused the tender, and I demanded the release and they did not surrender it."    Plaintiff put

in evidence a tender in writing of the amount received by him under the release contract, and a demand in writing for a surrender of the release. At the conclusion of the evidence submitted for the plaintiff, the defendant moved for a nonsuit, on these grounds: "1st. That.the plaintiff signed the release contract, which is in evidence, of his own volition, without fraud having been practised upon him. 2d. That the plaintiff's evidence shows that by the exercise of ordinary care and diligence he could have avoided the injury to himself. That he was an employee at the time of the injury, and he must show that he was without substantial fault." The court sustained the motion to nonsuit; whereupon the plaintiff excepted.

*Guerry & Hall* and *J. T. Hill*, for plaintiff. *John I. Hall, Thomson & Whipple*, and *Busbee & Busbee*, for defendant.

FISH, J. (after stating the facts.) Under the view we entertain of this case, it is necessary to consider only the first ground of the motion for a nonsuit, and therefore the evidence for the plaintiff as to how the injury occurred has been omitted from the statement of facts. If the release signed by the plaintiff· was binding upon him, in view of the evidence submitted, it would not matter whether the defendant company was originally liable or not. The plaintiff contends that he is not bound by the release, because, at the time he signed it, he thought it was merely a voucher for his lost time, and that nothing was said between him and Craven, the. trainmaster of the defendant company, in reference to the plaintiff's injuries, and the plaintiff had no conversation with Craven whatever about the injury the plaintiff had received and a settlement for it, and that he never knew until shortly before the suit was brought that the paper he had signed was a release to the railway company for liability for the injury which he had sustained. It does not appear from the evidence that Craven, or any other agent of the railway company, made any representations to the plaintiff as to what the paper contained, or that there was any device or artifice resorted to by the agents of the defendant to induce the plaintiff to sign the paper. The evidence shows that, after the plaintiff and Craven had discussed

the matter as to whether the defendant would allow the plaintiff anything for lost time, Craven wrote the release, handed it to the plaintiff and told him to take it to the cashier of the defendant company; that the plaintiff took the paper, carried it to the cashier, and signed it when he received the money; that he could read and write, but did not read the paper, and he testified that it was his own fault that he did not do so. Should the release be set aside under such circumstances? We think not. The plaintiff was not employed by the defendant by the month or by the year, or for any definite period of time whatever. Whenever his services were needed, he was called upon to go out with a train, as flagman, and was paid for the "trip." When he made a "trip," he was paid for it; and when he did not, he received no pay. There is nothing in the evidence to show that the railway company was under any contract to give him regular employment. Therefore he had no legal right to expect pay for the time lost by reason of the injury, so far as such lost time concerned any services which he was under contract to render the company and which he might have rendered but for this injury. Besides, the rule of the defendant company which he put in evidence, from its book of rules for the government of its employees, expressly provided that if any employee should be disabled, by sickness or other cause, the right to claim compensation would not be recognized, and any allowance, if made, would be a mere gratuity. This being true, when the plaintiff went to Craven, the trainmaster of the defendant, and asked if he intended to pay him anything for lost time, it was reasonable for Craven to think that plaintiff wanted some compensation for the damages which he had sustained by reason of the injury, of which damages lost time would necessarily be an element. Not having the right to demand any pay for lost time, unless it was a right founded upon and growing out of a general liability of the company to him for whatever damages he had sustained in consequence of the injury he had received, when he asked for pay for lost time it might naturally follow that Craven thought that all the damages which he claimed against the railway company was for lost time. Therefore, the simple fact that

Craven gave the plaintiff the release contract in question and told him to take it to the cashier does not show that Craven was trying to perpetrate a fraud upon him, by throwing him off his guard and procuring his signature to a contract releasing the railway company from all liability on account of the injury. Craven did not act like a man who was trying to fraudulently procure the plaintiff's signature to the paper. He did not tell him that the paper was a voucher for lost time, nor make any representation to him whatever in reference to its contents. He did not even ask the plaintiff to sign the paper, but simply handed it to him and told him to take it to the cashier, Mr. Austin. He turned over to the plaintiff, an intelligent man who could read and write, to be taken by him to another, an unsigned paper, which contained the catchwords, "release voucher," printed in large letters at its top, and which in plain and unmistakable language showed its true import. Surely this does not look like the act of a man who was trying, by a trick or artifice, to induce the plaintiff to sign such a paper in ignorance of its true character. The plaintiff, from his testimony, was, as we have said, evidently a man of intelligence. No fraud was practiced upon him. He had ample opportunity to read the release before signing it, and his gross negligence in failing to do so should estop him from having it set aside.

In *Radcliffe* v. *Biles*, 94 *Ga.* 480, G. W. Radcliffe presented his equitable petition against J. S. Radcliffe and J. B. Biles & Brother. It appears from the official report of that case, that J. B. Biles and J. S. Radcliffe requested the petitioner, G. W. Radcliffe, to go on J. S. Radcliffe's note for $2,000.00, as security. This the petitioner refused to do, but agreed with Biles that he would stand the security and guarantee that J. S. Radcliffe should fully account with Biles & Brother respecting any mules J. S. had sold on their account, or turn over to them any notes or mortgages for which the mules might have been sold. Biles agreed to this arrangement; and the petition further stated that "it was then and there agreed that J. S. and Biles should draw up a paper to carry out this agreement. Biles and J. S. left petitioner in order to do so, and soon returned presenting

a paper signed by J. S., stating that the matter had been fixed up. Believing the paper contained the agreement he had made with J. S. and Biles, petitioner signed it; whereas it did not contain the agreement, but, as he afterwards learned, was two promissory notes for $1,000 each. This was a fraud upon him, as defendants well knew. He believed, when he signed, that he was only signing an agreement that J. S. should turn over the unsold mules and all notes and mortgages he took for mules sold, and account for all money he received from sale of mules." The petition prayed a reformation of the contract and that a suit in the city court on the notes be enjoined. The judge of the superior court refused to sanction the petition, and upon a writ of error to this court the judgment of the lower court was affirmed, this court holding that "One who executes and delivers a promissory note without reading or knowing its contents can not avoid liability thereon because he acted ignorantly, without showing some justification of his ignorance, either by his inability to read or by some misleading device or contrivance amounting to fraud on the part of the person with whom he was dealing." To the same effect, see *Haley* v. *Evans*, 60 *Ga.* 157; *Bostwick* v. *Duncan*, Id. 383; *Massey* v. *Cotton States Life Ins. Co.*, 70 *Ga.* 794; *Fuller* v. *Buice*, 80 *Ga.* 395; *Boynton* v. *McDaniel*, 97 *Ga.* 400; *Chicago Building & Mfg. Co.* v. *Summerour*, 101 *Ga.* 820. In *Wallace v.* Railroad Co., 25 N. W. Rep. (Iowa), 772, it was held: "A party who, having the capacity and opportunity to read a release of claims for damages for personal injuries, signed by him, and, not being prevented by fraud practiced upon him from so reading it, failed to do so and relied upon what the other party said about it, is estopped by his own negligence from claiming that the release was not legal and binding upon him according to its terms." See authorities cited in the opinion in that case. "One who, having opportunity and ability, neglects to read all of a receipt releasing a railroad company from any and all claims on account of or arising from an accident, and signs the same, can not claim that he thought it only related to time lost in consequence of the accident, and did not cover damages for the personal injuries sustained thereby." *Matteer v.* Mo. Pac. Ry.

Co. (Mo.), 16 S. W. Rep. 839. "Relief will not be given against a mistake, where the party complaining had within his reach the means, or at hand the opportunity, of ascertaining the true state of facts." Barker *v.* Northern Pac. Ry. Co. (Mo.), 65 Fed. Rep. 460, citing Brown *v.* Fagan, 71 Mo. 563; Railroad *v.* Shay, 82 Pa. St. 198; Pederson *v.* Railway Co. (Wash.), 33 Pac. Rep. 351, and other cases. While it is provided in sections 3982, 3983 of our Civil Code that equity may rescind and cancel a contract upon the ground of mistake of one party only, when the mistake is as to a fact material to the contract, and provided the complaining party applies for such relief within a reasonable time, yet section 3984 says: "If the party, by reasonable diligence, could have had knowledge of the truth, equity will not relieve; nor will the ignorance of a fact, known to the opposite party, justify an interference, if there has been no misplaced confidence, nor misrepresentation, nor other fraudulent act." From Jossey's own testimony it appears that he was the only party laboring under a mistake, that his mistake was caused by his own gross negligence, and not from the fault, fraud, or misrepresentation of the defendant's agents; and under such circumstances equity will not relieve him by rescinding the release. The case of *Werner* v. *Rawson*, 89 *Ga.* 619, was decided upon its peculiar facts, and, even if the judgment therein rendered was correct, the doctrine there laid down should not be so extended as to control a case like the present. Section 3974 of the Civil Code, properly construed, does not entitle a party to relief against the consequences of gross and inexcusable negligence in signing his name to a plain and unambiguous written instrument, when no fraud, artifice, or misrepresentation was employed to induce him to sign it, and when there is nothing to show that it did not embody the identical agreement which the other party actually intended to make.

　　　*Judgment affirmed.　　All the Justices concurring.*