## 1006. MARIETTA FERTILIZER COMPANY *v.* BECKWITH.

1. Where one party to a contract of sale knows that the other is laboring under a delusion or mistake with respect to a material fact affecting the value of the property, and not only keeps silence with reference thereto, but, by artifice, adds color and credence to the delusion or mistake, he is guilty of fraud equivalent to an express misrepresentation.

2. To constitute legal deceit and fraud by the use of language, the language need not affirm the existence or non-existence of something which is untrue; it is sufficient if the language of one party to a contract misleads the other party as to the existence of a fact, and thereby induces him to enter into the contract.

3. If the holder of a promissory note has knowledge of any fact which affects the value of the note, he is under a legal obligation to disclose it to a proposed innocent purchaser of the note. When he fails to do so, the purchaser is entitled to have the contract of purchase rescinded.

4. The rule of law that in commercial transactions the parties trade "at arm's length" is venerable with age, but not fragrant with commercial honesty. It applies only where the struggle for advantage is in the open, with no masked batteries of fraud, and with no deceitful conduct by which one antagonist is disarmed.

5. There is evidence to support the verdict; the trial judge approves it, and so do we.

Appeal, from Newton superior court—Judge Roan. January 18, 1908.

Argued March 13,—Decided April 20, 1908.

*B. T. Frey, Rodgers & Knox,* for plaintiff.

*L. L. Middlebrook,* for defendant.

HILL, C. J. The Marietta Fertilizer Company sued W. B. Beckwith in the county court of Newton county, on a check given by him and payable to the order of the plaintiff. A judgment for the plaintiff was entered in the county court, and an appeal was entered to the superior court. The defense made was the alleged fraudulent conduct of the agent of the plaintiff, relating to the consideration for the check; and on the trial the jury found a verdict in favor of the defendant. The plaintiff's motion for a new trial was overruled. The material facts of the transaction may be briefly stated as follows: The check in question was given by the defendant to one Frey, agent of the plaintiff, for a promissory note made by one W. F. McCullough, payable to the order of the plaintiff. Frey was endeavoring to collect this note and others as agent of the plaintiff. On the day he sold the note to the defendant he had previously sold him several other notes for small

amounts. According to the testimony of the defendant, about an hour after he had bought the other notes, Frey again approached him; it was about the time the train was due on which Frey was to go as a passenger, and he (Frey) was in a hurry, "and he told me that he had another note that he wanted to sell me, on Mr. McCullough right down the road two or three miles. He said that he had not intended to sell this note when he sold the other notes, but he had decided to sell it. He told me it was on Mr. McCullough two or three miles down the road. He left the impression on me that it was Mr. Burrell McCullough. I told him that Mr. Burrell McCullough was a man that paid his obligations promptly, as much so as any man I knew, and I did not see why he did not pay the note, as the note was then past due. He said Mr. McCullough said he came up to pay off the note, two or three times last year, and could not find him. He said that Mr. McCullough had a lot of cotton there at the gin-house, at the market, but he did not care to sell it right then, but he would arrange to pay off the note in a few days. He said he would sell me this note at the same discount as he sold the others, that he was in a hurry to catch the train. . . I told him that if Burrell McCullough gave them that note, there was no trouble about it, and I would take it. He said 'He acknowledges this, does not deny it; if there is any trouble about it, it is my note.' I gave him a check for the note." "I had the note in my hand before paying it, but did not notice it closely, as I did not have on my glasses. I noticed it afterwards, and the signature was pretty dimly written. Mr. Frey made the impression on my mind that it was Mr. Burrell McCullough's note. If I had known that it was on W. F. McCullough, I would not have bought it. The next day I saw Mr. Burrell McCullough and called his attention to the note, and he told me that it was not his, but his son's note; and I stopped payment on the check at the bank. I know both of the McCulloughs, and can tell the letter B from the letter W. Frey told me it was Mr. McCullough down the road two or three miles. He did not tell me that it was Burrell McCullough, nor did he tell me it was on W. F. McCullough. He told me it was on Mr. McCullough down the road. Burrell McCullough lived down the road two or three miles from Mansfield, and W. F. McCullough lived about six miles in a different direction. Frey came to me in a hurry, right at train

time, to sell the note to me, and was in a hurry to get off on the train. I told Frey if Burrell McCullough acknowledged the note, I would take it. I called Burrell McCullough's name. I was very busy and Frey was in a hurry. When I told him that Burrell McCullough was a man noted for promptness in meeting his obligations and I could not see why he had not paid the note before this, he replied that he came last fall two or three times and wanted to pay it, but could not find him. Burrell McCullough had a gin-house. W. F. McCullough did not have a gin-house."

Frey, the agent for the plaintiff, testified, that in the afternoon, before selling the note to the defendant, he went to see Burrell McCullough, and Burrell McCullough told him that the note was not his, but was made by his son W. F. McCullough; that he tried to sell the note to Burrell McCullough, and that he then went to see W. F. McCullough about paying the note, and that W. F. McCullough told him that he had cotton and in a few days would get it ginned and pay the note, and that there was a lot of cotton lying around the gin. Frey denied that the defendant mentioned the name of Burrell McCullough to him or stated that Burrell McCullough was a good man and would pay his debts; and he denied any fraudulent conduct on his part inducing the defendant to purchase the note, but claimed that the transaction was entirely legal and free from any fraud, and that the defendant had full opportunity of examining the note before he bought it. It was proved by another witness in behalf of the defendant that he had gone with Mr. Frey the afternoon before, to the house of W. F. McCullough, and that W. F. McCullough said that he would pay the note when he was able. This witness saw no cotton at W. F. McCullough's lying around or in the field. And it was also proved that Frey had been informed by an attorney, to whom he had delivered the note on W. F. McCullough for collection, that he could not collect it.

It will thus be seen that the only issue in the case is the one of fraud; and in this connection it may be said that this issue was fully, fairly, and accurately presented to the jury in the charge of the court, and that the assignment of error upon an excerpt from the charge on this subject, as not authorized by the facts, is entirely without any merit, as this excerpt contained statutory and well-settled definitions of both actual and constructive fraud, and

was entirely pertinent to the issue made by the evidence. The only question in the record for this court to determine is, whether the verdict in favor of the defendant is supported by any evidence. This case is a close one, under the facts and well-established principles of law. We can not say that the conclusion of the jury is unsupported; and any doubt which we may have we shall therefore solve in favor of the verdict; and we are more especially led to do this because the verdict seems to be in line with the strictest adherence to fair and honest dealing, in business transactions. We are aware that neither courts of law nor courts of equity maintain as high a standard of business and commercial integrity and honesty as is demanded by moral obligation. The doctrine of the Roman law, strongly approved by that great orator and lawyer, Cicero, that it is the duty of every man to disclose all facts to another with whom he is dealing which are material to his interest (Cic. de Offic. Lib. 3, ch. 13), is not generally enforced in courts of justice, either in England or America. 1 Story's Eq. Jur. (13th ed.) §205. While principles of justice and sound morals may require the most scrupulous good faith, candor, and truth, in all dealings whatsoever, the courts of law and equity take a more practical and commercial view of the question, and assign limits to the exercise of their jurisdiction, short of these principles. The well-established rule of the common law, that men who trade trade at arm's length, is applicable to business transactions, in the absence of any special fiduciary relations between the parties. This rule is not based on a high standard of business morality, but appears to be the outgrowth of practical business exigency. It is impossible to lay down any general rule which would govern in all cases, and the question of fraud must be determined by the particular facts of each case. Mr. Justice Atkinson, in the case of *Wood* v. *Cincinnati Safe Co.,* 96 *Ga.* 123 (22 S. E. 909), states with terseness and perspicuity the general principles on the subject: "Fraud is exceedingly subtle in its nature. There are infinite means by which it can be accomplished. In its conception human ingenuity is limitless in its capabilities. It is therefore impossible to state any general rule by which particular frauds are to be identified. Classification is almost, if not quite, impossible. It may be perpetrated by willful misrepresentations made by one person to another, with a design to mislead and which do actually mislead. It may

be perpetrated by signs and tricks, and even silence may in some instances amount to fraud." Pothier, in his work on Obligations, says, that the term "fraud" is applied to every artifice made use of by one person for the purpose of deceiving another. 1 Poth. Oblig. 19. And Chancellor Kent, in his great work, has laid it down as a general rule that, "each party is bound in every case to communicate to the other his knowledge of material facts; provided, he knows the other to be ignorant of them." 2 Kent's Com. 482. These general principles relating to the subject of fraud are to be construed, of course, in connection with the general rule, equally well established, that the law does not afford relief to one who suffers by not using the ordinary means of information, whether his neglect is due to indifference or to credulity. When the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means he will not be heard to say, in impeachment of the contract of sale, that he was deceived by the vendor's representations. *Hart* v. *Waldo,* 117 *Ga.* 598 (43 S. E. 998); *Branan* v. *Warfield,* 3 *Ga. App.* 586 (60 S. E. 325); Andrus *v.* St. Louis Smelting Co., 130 U. S. 643 (9 Sup. Ct. 645, L. ed. 1054); Slaughter's Adm'r *v.* Gerson, 80 U. S. 379 (20 L. ed. 627).

As to the transfer or sale of promissory notes, the Civil Code, §3685, declares, that "Every transferor of a negotiable instrument, whether by indorsement or delivery, warrants (unless otherwise agreed by the parties) that he is the lawful holder and has a right to sell, that the instrument is genuine, and that he has no knowledge of any fact which proves the instrument to be worthless, either by insolvency of the maker, payment, or otherwise." And in the case of *Gordon* v. *Irvine,* 105 *Ga.* 144 (31 S. E. 151), the Supreme Court says, that "The holder of a promissory note who has knowledge of the insolvency of its maker is under a legal and moral obligation to impart such knowledge to an innocent purchaser before negotiating it. When he fails to do so, and the purchaser is thereby injured, an action of deceit will lie by the latter against the former." Applying these principles of law to the facts of this case as shown by the defendant, was there evidence sufficient for the jury to find in favor of the defendant on his plea of fraud? Did the agent of the plaintiff, at the time he sold the note to the

defendant, know any fact, in reference to the note, that he was under a legal obligation to disclose to the defendant? He knew that the note was not made by Burrell McCullough. He knew that it was made by W. F. McCullough, and that the amount due could not be made out of him. He also knew that the defendant was under the impression that the note was made by Burrell McCullough, who promptly paid his debts. Knowing these facts, was it not his duty in good faith to have informed the defendant of his error? The language of the great English chancellor, Lord Ellenborough, applies here: "He saw that the defendant had fallen into a delusion in supposing the picture to be Sir Felix Agars, and yet he did not remove it. *Not removing that delusion might be taken as equivalent to an express misrepresentation.*" Hill *v.* Gray, 1 Starkie, 434. Where one of the parties to a contract is mistaken in a material matter pertaining thereto, and the other party, knowing of such mistake, is silent in regard thereto, such silence is a fraud upon the mistaken party. *Wyche* v. *Greene, 26 Ga.* 415; *Shelton* v. *Ellis,* 70 *Ga.* 297. To meet these facts and inferences, the plaintiff says that the defendant had the note in his possession, looking at it, and had full opportunity of seeing that as a matter of fact it was not signed by W. B. McCullough, but by W. F. McCullough. But the plaintiff's agent who sold the note saw that the defendant had not discovered this fact. Did the plaintiff's agent, instead of removing any apparent delusion of the defendant as to the real maker of the note, endeavor in any manner, by any artifice, to keep or strengthen him in such delusion or mistake? The defendant says, on this subject, that the agent told him it was a note of Mr. McCullough, down the road two or three miles. The defendant further says, that he expressed surprise that Burrell McCullough (calling his first name) had not paid his note, as he was as good a man as any one he knew, and that he told him that if Burrell McCullough gave the plaintiff that note, there was no trouble about it, and that he would take it; and that to this the agent replied, "He acknowledges it, does not deny it. If there is any trouble about it, it is my note." If this testimony is true (and the jury believed it), can it be said that there was no artifice on the part of the agent of the plaintiff, to deceive the defendant as to the truth of the case and to keep him under the mistake that the note was the note of Burrell McCullough? Section 3534

of the Civil Code provides, on the subject of fraud, that, "Where one party knows that the other is laboring under a delusion with respect to the property sold or the condition of the other party, and yet keeps silence," such silence amounts to perpetration of actual fraud. Now fraud may consist of deceit by language or act, or by both; and to constitute deceit and fraud by the use of language it is not essential that the language should distinctly affirm the existence or non-existence of something that is untrue, but "it is sufficient that the language of one party is such as to convey to the other party to a contract the existence of a fact, or state of facts, which induced the party to enter into the contract, but which were untrue." 3 Fields' Lawyers' Briefs, 569, and cases there cited.

Did not the language of the agent induce the defendant to believe that Burrell McCullough had made this note? Did not he almost expressly declare, according to the testimony of the defendant, that it was the note of Burrell McCullough? For in reply to the statement of the defendant that if Burrell McCullough made the note, there was no trouble about it and he would take it, the agent said, "He acknowledges it." Besides, in stating that the Mr. McCullough who made the note lived "two or three miles down the road," when he knew (because he had been to Burrell McCullough's house the afternoon before) that it was Burrell McCullough who lived there, and also knew that W. F. McCullough did not live two or three miles down the road, but "six miles in a different direction" (for he had also been to W. F. McCullough's house the afternoon before), was he not inferentially misstating the facts, for the purpose of keeping the defendant in ignorance of the truth? Did not this language of the agent of the plaintiff tend to divert the attention of the defendant from the critical examination of the signature of the note; and was it not obviously intended to prevent such examination, and to allay any suspicion which the defendant had as to who was the maker of the note? These parties were dealing at arm's length, it is true, and if the defendant failed to discover whose name was signed to the note, or made a mistake wholly by his own negligence, unmixed with any deceitful artifice or conduct contributing to such failure or mistake by the agent of the plaintiff, it has been held that he would have no right to complain of the result of his own negli-

gence. But our code says that the transferor of a negotiable instrument warrants to the purchaser that he has no knowledge of any fact which proves the instrument to be worthless, either by insolvency of the maker, payment, or *otherwise* (§3685, supra). And the Supreme Court, in *Gordon* v. *Irvine, supra,* declares, that the holder of a promissory note is under a legal and moral obligation to impart such information to an innocent purchaser before negotiating it; and that if he fails to do so, and the purchaser is thereby injured, an action of deceit will lie by the latter against the former.

On this question of the negligence of the defendant in not discovering the real signature to the note, the question of the emergency created by the agent of the plaintiff, in his hurry to take the train, may also be considered, according to several decisions of the Supreme Court. *Boynton* v. *McDaniel,* 97 *Ga.* 400 (23 S. E. 824) ; *Jossey* v. *G. S. & F. Ry. Co.,* 109 *Ga.* 439 (34 S. E. 664) ; *Angier* v. *Eq. B. & L. Asso.,* 109 *Ga.* 625 (35 S. E. 64) ; and especially *Wood* v. *Cincinnati Safe Co., supra.*

In addition to the testimony above quoted, which we think fully authorized the verdict of the jury, it should not be forgotten that the testimony also discloses an effort, on the part of the agent of the plaintiff, to mislead the defendant as to the ability of the maker of the note to pay it. He told the defendant that the maker of the note had cotton around his gin-house, and had promised to sell it and pay the note in a few days, while, another witness testifies, the maker of the note had no cotton, and had simply promised to pay the note when he was able to do so. The agent was under no obligation to speak on this subject, but if he spoke, he was under obligation to speak the facts.

After carefully considering all the evidence in the record, in the light of the authorities and decisions cited, we have come to the conclusion that the verdict of the jury was right, and that the judgment refusing a new trial should not be disturbed.

*Judgment affirmed.*