# GEORGIA COTTON GROWERS CO-OPERATIVE ASSOCIATION *v.* SMITH.

1. In a suit upon a written contract to deliver cotton for the purpose of marketing it for the benefit of the owner, which shows upon its face that it was intended to be signed by both parties, the defendant may plead that he was induced to sign the contract and deliver it to the agent of the bailee by false representations of the agent as to the contents of the paper, and that he could not read the paper because he did not have his glasses, and that the agent falsely promised to afford him the opportunity to read the paper and take counsel as to the meaning before sending it to his principal, and return it if not satisfactory to said owner.

2. The several requests to charge the jury, which were refused by the trial court, failed to state correct principles of law applicable to the case.

3. Under the evidence it was not cause for reversal to charge: "If you believe, under the evidence, facts, and circumstances in this case, that W. W. Johnson was a general agent of the association, then his authority would be construed to include all necessary and usual means for effectually executing it."

4. Other grounds of the motion for a new trial, complaining that the verdict was contrary to specified portions of the charge, are merely elaborative of the general grounds.

---

Agriculture, 2 C. J. p. 998, n. 31 New.
Appeal and Error, 4 C. J. p. 905, n. 41; p. 1029, n. 30.
Contracts, 13 C. J. p. 371, n. 29.

5. The verdict for the defendant was authorized by the evidence, and there was no error in refusing a new trial.

No. 5236.    FEBRUARY 18, 1927.

Equitable petition. Before Judge Perryman. Warren superior court. December 7, 1925.

The Georgia Cotton Growers Co-operative Association, a corporation organized under the act approved August 15, 1921 (Acts 1921, p. 139), known as the "co-operative marketing act," with its principal office in Fulton County, Georgia, sent out an agent to obtain members for the association, and to obtain from such members contracts binding them to ship to the association all cotton which they might produce or acquire during specified years, for the purpose of being marketed by the association with cotton of other members, according to a pooling system outlined in the contract, and binding the association to market the cotton in accordance with said pooling system and make remittances to the several members for the net proceeds of the cotton. The agent approached W. J. Smith, a cotton grower in Warren County, Georgia, who was at the time in his field about one mile from his home, and requested him to become a member of the association, and to sign a contract with the association for delivery of his cotton covering the years 1922 to 1926, inclusive, to be marketed as above indicated. Smith signed the contract as presented to him by the agent on June 20, 1923, and the agent turned over the paper to the association in Atlanta, and the association by its secretary signed it on June 25, 1923. The paper was not under seal, and did not purport on its face to have been "delivered." It contained nineteen paragraphs. Paragraphs 4, 13, and 18 were each subdivided into paragraphs (a), (b), and (c) respectively, and paragraph 16 was subdivided into paragraphs (a) and (b). The paper contained, among others, the following provisions: "All cotton shall be delivered . . to the order of the association, at the warehouse if the association controls a warehouse in that immediate district, or by shipment as directed to the association, and by delivery of the indorsed warehouse receipts or bill-of-lading properly directed. . . The association shall make rules and regulations and shall provide inspectors or graders or classifiers to standardize, grade, and class the quality of and the method and manner of handling, pressing, and shipping such cotton, and the grower agrees to ob-

serve and perform any such rules and regulations and accept the grading established by the State and Federal authorities and the association. . . The association may sell the said cotton, within or without this State, directly to spinners or exporters or otherwise, at such times and upon such conditions and terms as it may deem profitable, fair, and advantageous to the growers; and it may sell all or any part of the cotton to or through any agency, now established or to be hereafter established, for the co-operative marketing of the cotton of growers in other states throughout the United States, under such conditions as will serve the joint interests of the growers and the public; and any proportionate expense connected therewith shall be deemed marketing costs. . . The association may establish selling offices, warehouses, plants, marketing, statistical, or other agencies in any place."

Smith repudiated the paper after he had signed it. On September 29, 1924, the association instituted suit against Smith for specific performance of the contract, for injunction to prevent future sales of his cotton to other persons, and for alleged liquidated damages for cotton that had already been sold by him in violation of the terms of the contract. The defendant filed his answer. A demurrer to several paragraphs of the answer was sustained, and no exception was taken to that judgment. It was overruled as to paragraphs 15 to 21, inclusive. Plaintiff excepted pendente lite to this ruling. Paragraphs 15-21 of the answer were as follows:

(15) "Defendant denies that said contract is binding upon him, for the good and sufficient reason that his signature to said paper signed by him was induced by the fraudulent conduct and fraudulent representation of the agent of the plaintiff, and that the paper or contract to which defendant attached his signature is not binding upon him for the further reason that he was induced by said fraudulent conduct and representations of plaintiff's agent to sign the same."

(16) "Defendant says that the paper signed by him was signed on his farm about seven miles from Warrenton and about four miles from Norwood, and at the time it was signed he was in the field a mile or more from his home. That he did not have his glasses with him, and that he could not see to read the paper, and explained this situation to plaintiff's agent, and for that reason declined to sign the paper. Defendant says that he does not read

well at best, and that he is an uneducated man, and that with the aid of his glasses so that he could see intelligently read and intercept [interpret?] a contract such as is sued on in this case, and that all of this was explained by him to plaintiff's agent."

(17) "Defendant says that notwithstanding this statement by him to plaintiff's agent, that the agent then and there took renewed energy and became persistent in his efforts to get defendant to sign the contract, and explained to defendant that he was telling him absolutely the truth as to what the contract contained, and said to defendant that he could rely absolutely on what he, the agent, said as to the contents of the contract; and after making this statement to defendant, and defendant explaining to him that he would have to rely on him as to the contents of the contract at that time, as he could not read, and after further representations by plaintiff's agent that if defendant would sign the contract that he, the agent, would bring it to Warrenton and hold it here until defendant could come to Warrenton and have the contract read and interpreted to him, and that is [if?] he then decided he wanted to enter into the contract he could do so, and if he did not, that the agent would then return the contract to him, it having been distinctly signed and given to the agent with this condition attached to the delivery of it."

(18) "Defendant says that the representations made by the agent there, other than those set out above, which induced him to sign the paper which he signed, were in part as follows: Said Johnson, the agent of the plaintiff, when he approached this defendant, told defendant that he was representing a co-operative marketing association. That said association had arranged with a warehouse at Warrenton in which the Warren County cotton was to be stored. That arrangements had been made with W. W. DeBeaugrine Jr., a man well known to defendant, and in whom defendant had implicit confidence, to take charge of and run said warehouse. He further represented to defendant that W. W. DeBeaugrine Jr. would grade defendant's cotton and mingle it with other cotton of the same grades, the said DeBeaugrine, however, to keep the record as to its weight and grade, and that when said cotton was sold and shipped from Warrenton that this defendant was to be paid then and there by Mr. DeBeaugrine for his cotton. Defendant in said conversation had stated to said Johnson that he

was skeptical about shipping his cotton, for the reason that several farmers in Warren County, to defendant's knowledge, had shipped cotton to people whom they trusted, and had had their cotton sold, and had been unable to realize from the people who sold it the money for the cotton, as several cotton factors to defendant's knowledge had sold their customer's cotton and embezzled the proceeds thereof. After having made this statement to said Johnson, Johnson then made the representations to defendant as above set out, and they induced defendant to sign said paper."

(19) "Defendant further says that Johnson, at the time he procured this defendant's signature, further stated to this defendant that defendant could deliver to plaintiff such part of his cotton crop as he desired to, and need not deliver any part if he did not wish to, and that there would be no expense attached to making of a contract with plaintiff unless the defendant delivered some cotton, and that if he did deliver cotton that he would then be called upon to pay to the plaintiff $10.00 as membership fee. That the above-stated representations were made to this defendant by the said Johnson and after Johnson had represented to defendant that there was nothing in the paper which he signed to the contrary of which is set out herein, and after his further agreement to hold same until defendant directed him to send it in; and relying upon said representations this defendant agreed to the said Johnson that he would sign said paper offered to him by Johnson, and signed it believing that he could rely on what Johnson had told him."

(20) "Defendant says that he signed the paper presented to him for signature by the said Johnson at a time when he could not read it, and where he could only rely upon the representations made by Johnson, he at the time relying upon Johnson's representations and expecting at the first opportunity to make further investigation, and advise Johnson whether to send the paper to the association or not, and relying on Johnson's statement that he could make further investigation and that he would find Johnson's representations to be true, and that he could retake his contract as aforesaid if he desired; and this defendant says that he did make further investigation and did attempt to get a return of the paper which he had signed, from Johnson, but that he learned that the said Johnson had delivered the paper which he had signed to plain-

tiff in the meantime; and he then advised plaintiff, by making the statement to various representatives of the plaintiff who called upon him at different times, that he had not entered into a contract, and that he did not intend or expect to live up to such a contract as the paper which Johnson induced him to sign by his false and fraudulent representations actually proved to be."

(21)  "Defendant says that he does not dispute any of the terms of the contract attached to the petition and marked 'Exhibit A.' That he did not read said contract, for the reasons set out hereinbefore; that is, because he was unable to do so; and defendant further says that he would never have signed the same had it not been for the above-mentioned fraudulent representations of plaintiff's agent, relied upon by this defendant, which induced him to sign his name to the paper presented to him by plaintiff's agent for signature. Defendant says that for the foregoing reasons he is not a member of the plaintiff corporation, and is not bound by the contract sued upon, and is not indebted to plaintiff in any sum; and that plaintiff is not entitled to the remedy of an injunction against him or to any other rights against him."

At the trial the plaintiff introduced evidence tending to support the allegations of the petition. The defendant introduced evidence tending to support the allegations in paragraphs 15-21 of the answer. A verdict was returned for the defendant. The plaintiff's motion for a new trial was overruled. In its bill of exceptions it assigns error on the ruling just stated, and upon the exceptions pendente lite.

*Bryan & Middlebrooks, S. B. Swilling,* and *E. P. & J. Cecil Davis,* for plaintiff.

*M. L. Fells,* for defendant.

ATKINSON, J. The oral demurrer to the several paragraphs of the answer was upon the ground that they failed to set up a legal defense to the action or any legal reason why plaintiff should not recover in the action. The assignment of error is upon the judgment refusing to strike paragraphs fifteen to twenty-one, inclusive. Do these paragraphs when considered together set up a valid defense to the action? They do if they allege such fraud in the procurement of the paper sued upon as would prevent it from becoming a binding contract upon the defendant. In *Chapman* v. *Atlanta Guano Co.,* 91 *Ga.* 821 (18 S. E. 41), involving fraud in

the procurement of a promissory note, a plea setting up the fraud was held sufficient which alleged that the agent of the payee represented that the note was for a stated sum when in fact it was for a larger sum, and that the note was made at night when defendant could not see very well and could not see the amount, but, relying on and having confidence in the agent, defendant signed the note. In the opinion it was said: "The pleas, in effect, state that the plaintiff's agent represented the note to be for $53.10, while in point of fact it turned out to be a note for $90.20. This was not a matter for a mere difference of opinion. If the pleas speak the truth, the plaintiff's agent perpetrated a palpable fraud upon the defendants, involving nothing short of actual dishonesty. . . In the case at bar [upon the question of diligence] one of the pleas alleges that the note was signed at night, when defendant signing the same could not well see; and another avers that the note was made at night, when defendant could not see the amount. These allegations, it is true, are not strong. They do not show that a light might not easily have been obtained if the defendant had desired it; or that there was any haste about the transaction; or that the plaintiff's agent urged or requested an immediate execution of the note, or did anything, except the making of the representations complained of, to prevent the defendant from fully informing himself of the amount set forth in the note. Still, we think the pleas contain enough to authorize the case to be submitted to a jury, and allow them to determine whether or not a fraud was actually practiced upon the defendant." This decision was followed in *Wood* v. *Cincinnati Safe &c. Co.*, 96 *Ga.* 120 (22 S. E. 909), sustaining a plea which set up fraud of an agent of a vendor, in misrepresenting the contents of a written order for a safe, and urging the vendee to sign the paper without reading it, in order to enable the agent to catch a train that was about to arrive. Both of the foregoing and other cases were discussed and distinguished in *Walton Guano Co.* v. *Copelan,* 112 *Ga.* 319 (37 S. E. 411, 52 L. R. A. 268), relating to fraud in procuring a promissory note; this court holding that the evidence was insufficient to support the defendant's plea of fraud. In the opinion it was said: "In the present case there were no misrepresentations made by the agent of the plaintiff at the time the note was signed. There was no trick or device by which the defendant

was induced to sign the paper. He had full opportunity to read the same, and nothing done by the plaintiff's agent prevented him from doing so. Nor was there any emergency which required haste, though an emergency of the defendant's own creation would, of course, not have availed him as a defense. The only excuse offered by him for not reading the note was that he relied upon the agent of the plaintiff to have the note drawn in accordance with the prior agreement made with him. If the defendant has signed a contract which does not express the terms of the agreement entered into between him and the plaintiff, this is due to his own gross negligence in failing to use the precautions which an ordinarily prudent man would have taken advantage of; and the courts will give him no relief; he must abide by the contract as executed." The same doctrine was announced in *Jossey* v. *Georgia Southern &c. Ry. Co.*, 109 *Ga.* 439 (34 S. E. 664), involving a contract releasing the railroad company from liability for a personal injury alleged to have been caused by the latter's negligence; and in *Rounsaville* v. *Leonard Manufacturing Co.*, 127 *Ga.* 735 (56 S. E. 1030), involving a written order for goods.

Paragraphs 15 to 18, inclusive, of the answer in the present case, which the trial judge refused to strike, state the substance of several material representations alleged to have been made by the agent, which were at variance with the provisions of the paper which the defendant signed. After setting these out, it is stated in paragraph 19: "After Johnson [the agent] had represented to defendant that there was nothing in the paper which he signed to the contrary of which is set out herein, and after his further agreement to hold same until defendant directed him to send it in, and relying upon said representations, this defendant agreed to the said Johnson that he would sign said paper offered to him by Johnson, and signed it believing that he could rely on what Johnson had told him." This allegation, as against a general demurrer, was a sufficient statement that the agent misrepresented the contents of the paper that was signed. Other allegations to the effect that the defendant did not have his glasses and could not read without them, and that the agent in order to induce his signature promised to afford him the opportunity to read the paper and take counsel as to its meaning before sending it on to the association, and return it to him if it was not satisfactory, were sufficient, un-

der the ruling in *Chapman* v. *Atlanta Guano Co.,* supra, to relieve the defendant from the charge of negligence in signing the paper without reading it.  It is urged by the plaintiff that, the paper having been "delivered" to the agent of the association, the contract was complete, and the defendant would not be heard to set up that the delivery was conditional.  This position is untenable. The paper contains mutual obligations, and shows upon its face that it was intended to be signed by both parties.  At the time of the so-called "delivery" to the agent it was signed only by the defendant, and was not a completed contract.  *Clarke* v. *McNatt,* 132 *Ga.* 610 (1 *a*) (64 S. E. 795, 26 L. R. A. (N. S.) 585).  The case differs from *Smith* v. *Georgia Railroad &c. Co.,* 131 *Ga.* 470 (62 S. E. 673), which referred to a complete contract.  Even in the case of a completely formal contract of insurance it was held, in *Moore* v. *Farmers Mutual Insurance Asso.,* 107 *Ga.* 199 (33 S. E. 65) :  "It is competent and lawful for an insurance company, in defense to an action upon a fire policy purporting to have been issued by it, to plead that the same was never in fact delivered, but merely handed to the person therein named as the insured, under an agreement that it was not to become binding upon the company until he had canceled another policy in a different company insuring the same property, which was never in fact done; and parol evidence is admissible to prove a plea of this kind." It would be a fraud for the agent to obtain the defendant's signature and possession of the paper under promise to hold it and afford the defendant opportunity to read and take counsel as to its meaning, and to take back the paper if he did not like the contract, and then, without complying with such promise, forward it to the association to enable it to sign the paper and enforce it as a complete formal contract.  The trial judge did not err in overruling the demurrer.

The rulings announced in the headnotes other than the first do not require elaboration.

*Judgment affirmed.  All the Justices concur.*